Good morning, everyone. Mr. Jakes, before you approach, let me just announce that the panel has before it one case being decided later today, just on the briefs, without oral argument. That is Appeal 3294, Considine v. NCUA. On our argument list, we'll hear argument first in Appeal 1421, Leviton MFG v. Universal Security. Welcome to the court once again. Good morning to you. Please proceed. Good morning, and may it please the court. This court said in Northern Telecom v. Data Point about 20 years ago that inequitable conduct should be determined in light of the realities of patent practice and not as a matter of strict liability, whatever the nature of the action before the PTO. The district court in this case didn't follow that guidance. Instead, what was a routine act of patent prosecution has been magnified out of proportion and portrayed as an intent to deceive. What standard of review applies here? It seems to me your brief suggests summary judgment, but this was in the context, was it not, of a motion for attorney's fees. So what standard do we apply? I believe the summary judgment standard has to apply. That's the standard that the magistrate judge and the district court applied in finding that there were no disputed issues of material fact. I also think because of the importance of the issue in equitable conduct that if there are disputed issues of fact, the court should have an evidentiary hearing and resolve those issues in accordance with the normal procedure. Did your side ever ask for an evidentiary hearing? We did after the hearing on the motion. And after the decision, right? Yes. The motion was presented, and it was presented on the papers, and the judge decided it and said there were no disputed issues of material fact. Were you ever advised by the magistrate judge that there wouldn't be a trial-like proceeding, that the motion, including the underlying issue of inequitable conduct, was going to be decided as if it were a summary judgment proceeding? Your Honor, I don't believe that that was ever decided one way or another. The hearing was scheduled on the motion without an evidentiary hearing, and I admit we did not ask at that time and ask, can we bring live witnesses? We understood that it would be an argument on the papers, but if there were disputed issues of fact, as it turned out, there should have been. Isn't it the case that your side put in some additional documents by leave of the magistrate judge at that hearing? Yes, we did. And then why shouldn't we perhaps conclude that if you wanted to present live testimony or yet further documents, that was your chance, that was your speak now or forever hold your peace moment, and if your side, I know it wasn't you and your firm, but if your side didn't at that point say, judge, we've got to have an evidentiary hearing, or judge, at least let us put in some affidavits because there's some issues here that aren't well framed. We did not do that, your Honor, and we could have at that time, but we did not understand also that the judge was going to resolve this saying there were no disputed issues of fact. Well, what happened right after the magistrate judge's decision? Did you ask for reconsideration and say, hey, wait a minute, we thought we were going to have a trial, and you decided this all on the papers, and now, you know, let us reopen this and let us bring in live witnesses? We filed our objections to the district court and did raise that point. We did not re-ask the magistrate judge to hear evidence. Let me just be clear on how this came down. You're at the hearing. This is a hearing on the motion. Were you there? When you were leaving the hearing, did you conclude that there were no issues of, disputed issues of material fact, or was it in your view, I mean, since you didn't put on evidence, suggest that you thought the issues, there were no disputes of material fact? Your Honor, we believed that this was so far from an equitable conduct that we wouldn't even get to that point, that the evidence, the record that had been presented was so far the thresholds of materiality and intent that it wouldn't be even reach that point. Well, does that mean that we could say that you proceeded on the assumption that a summary judgment disposition would be fine and that you were so confident you would win that you weren't interested in putting in more evidence, the extent evidence you thought was a sure win for you, so therefore we shouldn't hear a complaint now that you actually wanted a trial? That's a fair point, Your Honor, and I have to admit that the procedure that this came up on, it is a little confusing because it's on a motion for attorney's fees, which is not normally handled in the normal course as an equitable conduct is, whether there's a summary judgment motion, and we may have gotten that wrong, but we certainly did not think that this evidence rose to the level of an equitable conduct, and we did ask for an evidentiary hearing afterward. For purposes of this argument, I would still contend that what's on the record now is not enough, so that's really our first argument anyway. Well, even if there is no evidentiary hearing, I mean, what kind of animal is this? I'm a little confused because whether you asked for an evidentiary hearing or not, I still have to figure out whether this was a decision made in a summary judgment-like fashion or whether this was a decision made at the conclusion of something more akin to a trial, and I realize this doesn't fit squarely in either, but I'm not positive the absence of your request for an evidentiary hearing dictates which one I treat it like. I think that that's true. The best guidance we have is what the magistrate judge said she was doing and what the district court judge said as well. She treated it as summary judgment, applied the summary judgment standard, said there were no disputed issues of material fact. I think it should be reviewed on that basis because that's the way the court decided it. But having said that, the evidence that was before the court I don't believe rises to the level of materiality or intent in any event. The evidentiary hearing could have shed light on Mr. Narcisse's credibility, whether his testimony was credible or not, which is something that's usually critical for an equitable conduct. Mr. Jakes, you knew from the record of Narcisse's deposition that something like half of the answers sought were blocked by attorney objection. Yes. So if your side's position was, well, we know that Narcisse can justify what he did and what he didn't do, but you also knew that his deposition was very incomplete. It wasn't a burden on you to fill in the gaps in his deposition through an affidavit or some like manner. If you look at his deposition, I believe there is enough there. He answered a lot of questions. He answered a lot more than were objected to. He explained that he didn't believe the germane application was material. There were questions that went to his state of mind, his mental impressions, that there was a work product objection to. But didn't Judge Davis, I'm trying to recall, didn't Judge Davis complain about the incompleteness, I'll call it, of the explanation by Narcisse as the prosecuting attorney of the patent application? Yes. So that was kind of held against him. It was. But shouldn't your side have been able to predict that the gaps in his deposition would be held against him? Not under this Court's case law because in an inequitable conduct situation, even if there is no credible explanation for what happened, that can't be held against us. There has to be other evidence of intent. Well, let me ask you this. We may not have spelled this out, but wouldn't it maybe be a logical paradigm to say that if the defendant in the case who's attacking the patent puts on a strong case of materiality and intent, that at that point a burden shifts, I guess we might call it a burden of side to come forward with the explanation talked about in Praxair, some plausible, rational explanation. Would you agree that that's consistent with the case law and appropriate in a circumstance like this very case? I believe that's consistent with the case law, but I don't think it's what would have happened here because I don't think that that strong case of inequitable conduct was made out in the first place. Well, taking the Praxair paradigm, in that opinion we talked about high materiality. Is it your view that there was no indication here of high materiality and for that reason there couldn't be any shifting of any sort of burden? That would certainly be one of the points. As the judge did in this case, the magistrate judge found that the threshold of materiality had been met, that it would have been important to a reasonable examiner, but refused to go any farther. Would you think Praxair can be limited to circumstances of where high materiality has been found in order to trigger some burden of coming forward with an explanation by the prosecutor? I think that is one way to reconcile that case with some of the other courts' case law. And that's certainly not the situation here, although the judge did say it was highly material. That's not backed up in the record or really in the findings. High materiality... Judge Davis said. Judge Davis, as well as the magistrate judge. We're treating them both together because Judge Davis... So there was a finding of high materiality. There was. And then a detailed analysis. But there is no support for that. A finding of high materiality would be, for example, but-for materiality, that the claims wouldn't have issued. Or at least make a prima facie case. Well, you can't impose on us, because of our case law and this panel bound by it, that we're not limited by the PTO's definition of the but-for sort of approach to materiality. We have a much looser standard of materiality, wisely or not. Yes. And under our looser standard, I don't see that the finding by the two adjudicators of high materiality looks dubious. Well, this court's standard, the important to a reasonable examiner standard, it has been said that is the broadest standard. That's the lowest. There are other standards that would reflect a higher degree of materiality. I'm not saying you have to meet those to meet the threshold. But if all you do is meet the threshold, then you certainly haven't met that higher degree of materiality to say it would have been important to a reasonable examiner, but what would he have done with it? Wait. Are you suggesting-I mean, what is the case? I mean, your suggestion is that sort of as a matter of law, to find high materiality, you have to find that it would have been outcome determinative. Is that the position you're taking? And if so, where's the support for that? I won't say that. But I will say that it has to be more than just the bare threshold to be high materiality. But we were talking about the standard, which it would be important to a reasonable examiner. Yes. So that's minimum? It is. This court has said that's the minimum. And to get higher to-so how do you-so what's your view of how you get to the highest level of materiality? Well, there are other levels. There's a prima facie case that the examiner could have made, and there is unpatentable information. Those certainly define a range. Important to a reasonable examiner is the threshold. It's the bottom. It's what this court has said is the broadest test. So- How about on the specific facts of this case? Yes. What about with respect to inventorship? If the withheld germane patent application had been put before the examiner, wouldn't it have been logical for the examiner to say, wait a minute, I got the same claims in these two applications, but two totally different sets of inventors. There might be an inventorship problem here. I better look into it. I better ask these parties to put in some declarations or whatever so I can sort out this issue. Whereas because the germane application was not given to the examiner, it would have never occurred to him that there might be a question about whether inventorship was inappropriate in one or the other of these applications. Yes. Let me first start by saying there is no question of an inventorship. There is no information here that would show that the inventorship was wrong. Germane might have led the examiner down the wrong path. I agree. Yes, but my point is regardless of outcome, if putting in the germane application to the examiner would have alerted him that there might be an issue, however it might properly be decided in the end of the analysis, it would tell him he better do an inventorship analysis. Whereas by withholding it, he's blindsided. He doesn't know there's any possibility of an inventorship analysis. So why isn't it important, that key word, important to the examiner to at least know whether there's a potential issue that he should examine? As you know, examiners do not routinely look at inventorship issues. This might have triggered something, but it would have triggered something wrong because there is no issue of inventorship. It's like submitting a reference to the examiner that is clearly not prior art. It serves no purpose other than for the examiner to say that's not prior art. Yes, but proper inventorship is a condition of patentability even though it doesn't depend on prior art. I was trying to make an analogy, Your Honor, and I may have done that wrong. But here there is no doubt the inventorship was correct. So although germane might conceivably have caused the examiner to think that there was something going on, there wasn't. And what about double patent? The same questions arise with respect to without the germane application, the examiner would have never thought there might be a double patenting issue. If it had been put before him, he could have examined that issue and decided whether it amounted to anything or not. But he, again, was blindsided because the germane application was never submitted to him. Well, let me be clear on that. The 766 patent was submitted in their germane application. There was a double patent rejection. It was wet after the 766 issued, right, and after the inequitable conduct allegations. And we've held re-exam, you can't cure deficient problems. This wasn't re-exam. This was before the germane application was examined on the merits. No, but obviously I'm asking you about when this patent was under examination. Yes. Why wasn't the germane application given in that examination to the examiner so that the examiner could see that maybe there's a problem here not only of inventorship but also of double patenting? Maybe. Now, maybe he would have decided it's a false, no problem. Yes. But by withholding it, he doesn't even know that there's a potential issue here. The MPEP, I think, says that that's not the way this would be handled because the 766 patent had the earlier priority date. That application would be allowed to issue. Then the double patenting rejection would have been given in germane, which is exactly what happened here. But don't we have case law that suggests what I guess we've called a two-way test with respect to double patenting? Yes, we do have a two-way test. And so doesn't that suggest that whether it's an earlier priority or not an earlier priority, that in both examinations the other should be put on the table before the examiner? The other thing I would point out is in the 766 patent there already was a terminal disclaimer filed and that it would expire five years before the germane application would. So although there are other aspects to double patenting and they have to be a common assignee and those sort of things, in the normal course of things, according to the MPEP, that's not what would happen here, that the first application would issue because it has the earlier priority date. The double patenting rejection would be made in germane, and that's what happened here. Let me ask you a question about an argument made I guess mostly in a footnote by the other side, which is that your client has sued the prosecuting attorneys or at least the law firm of the prosecuting attorneys. And as I read the footnote, it suggested that the gravamen or the core of the lawsuit was in effect an admission or an averment that material information had been withheld from the examiner by those very same attorneys. What can you tell us about the state of that lawsuit or what the allegations in the complaint are or are not? I believe the complaint is in the very end of your appendix. It's at the very tail end of it. It's the last thing in there. It does include a number of allegations against the law firm that go much farther than beyond this particular situation. And the outcome of it may in part depend on what this court does with inequitable conduct. There are different standards involved. There is a negligence standard when it involves professional responsibility and misconduct, and we're talking about inequitable conduct, which is a much higher standard. But I'm asking sort of more of a factual answer. They suggest, I thought, in their brief, particularly in the footnote, that you've in effect admitted misconduct by the lawyers from that firm who prosecuted the patent in issue here because of what you've said in the complaint. I think if you read the complaint, it does not say that. It does allege that they were derelict in their professional responsibility, but that is not the same thing as conceding inequitable conduct. And then what's the status today of that lawsuit? There has been a motion to dismiss in that case, and I believe it's currently stayed, but there will be a hearing at the end of March. So as of yet, there's no adjudication on any issue in that lawsuit? There is not, no. What exactly is your evidence that raises a genuine issue on intent? Genuine issue of fact. What exactly what? Tell me what is your best evidence that raises a genuine issue on intent. It would be Claude Narcisse's deposition testimony. And what in particular does he say that you think raises a genuine issue of whether or not he intended? He said he did not think Germain was material. Because? Because it was not prior art. But isn't it clear that in addition to prior art, there is other types of information that cannot properly be withheld from an examiner? That's true. That sort of leaves a hole in his assertion that it wasn't material because it wasn't prior art, but we all agree that some non-prior art things can nevertheless be material. That's true. But for purposes of summary judgment, you have to take him at his word. He did not believe it was material because he did not believe it was prior art. He may have been wrong, but that is what he believed. And whether it's a credible explanation or not, it is his explanation. Do we have to take him at his word if it seems absurd? This is a hypothetical question. I'm not actually meaning to comment that I think that. I just mean what is the level at which, I mean, obviously litigants could come in and try to avoid summary judgment by saying anything at all. And we don't accept as gospel all of those things if they're totally outrageous and inconsistent with everything else. So what is the standard that I look at when I assess whether or not that creates a genuine issue of fact? I think, as you've said, there has to be a point where an explanation like that would no longer be plausible. But his is certainly plausible, which is what our court's case is about. But it was undisputed in the record based on his deposition. Otherwise, all of the experience he had in prosecuting Pattinson and litigating it, that he was an expert. He was an experienced prosecutor, yes. I mean, there might be another case where plausibility might or might not arise given the context. But here, the basis for the district court and the magistrate finding it was implausible was very much based on undisputed testimony in the record with regard to his experience and not, right? But it also reflects on his credibility that they must have believed that what he said was untrue. Because if he subjectively believed that this was not material, that is important in assessing intent. I don't know how it cannot be. Yeah, but I thought you acknowledged to Judge Moore that the standard is something like whether it's plausible or whether one reasonably could assume that he was telling the truth based on all of that. I would certainly maintain that it was plausible in this case based on what he did. Do you think that his long experience, Narcisse's long experience, actually cuts in your favor as opposed to against you as the two judges seem to hold? Your Honor, I can see that going both ways. Certainly somebody who has experience should know more. But on the other hand, he also knows how the Patent Office operates, and he believed what he was doing was correct. So his length of experience adds credibility to the fact that he thought it wasn't material. Did you put in any testimony through affidavits or like measures of other prosecutors saying, oh, I would have done exactly the same thing that Narcisse did? I would have withheld that germane application because it would have been clear to me it was not appropriate to send that in to the examiner. We did not. But you could have. We could have. We did not do that. But his testimony is that he did not believe it was material. He has an explanation for that. Because it was not prior. That's right. And I haven't addressed the particular regulation that deals with copying. Certainly the title of that regulation is Request for Interference. Your briefing is very clear and explicit on that. Okay. Thank you. All right. Thank you. Now we'll hear from the other side. And since we gave Mr. Jakes eight minutes of additional time, we'll give you the same amount of additional time if you need it. Good morning. Welcome to the court. Thank you, Your Honors. Please proceed. Good morning, Your Honors. May it please the Court. My name is Susan Baker Manning. I'm with Bingham McCutcheon, and I rise on behalf of Appellee Shanghai Mayhow Electric, Inc. After an extensive factual review, the magistrate judge issued her 128-page opinion detailing how Levitin committed both inequitable conduct and committed litigation misconduct in an effort to cover up that inequitable conduct. Well, why do we care how many pages the opinion is? I mean, is it automatic affirmation if it's over 100 pages? No, sir, not at all. But my point is that the district court took a long, very hard look at the facts of this case. Well, it didn't have a trial. It didn't have a trial. Some people would say that's not a very careful, long, hard look. Right. I mean, normally before inequitable conduct is found, we have a trial, especially in the case of withholding. Now, if an applicant flat-out lies and it's right there in the documents, then you might not need a trial. But in a case where the inequitable conduct is based exclusively on the idea that something was withheld that should have been submitted to the examiner, to not have a trial, very unusual, and I can't remember a summary judgment of inequitable conduct based on withholding. There may be one out there, but I sure don't remember one. I certainly agree that the procedural posture of this case is unique. We haven't been able to identify anything like it in the case law. One of the reasons for that is Levitin's strategic decision to dismiss the case while we're in the middle of discovery. As we read from the magistrate's opinion, she's about to grant a motion to require them to actually answer a number of the questions they haven't answered. Why and when and how they dismiss the case is not an issue in this appeal. Right. But Your Honor's question was about whether the magistrate judge should have held a bench trial. And if I may refer to you to page A1393, note 4 of the appendix, Levitin discourages the magistrate from holding an evidentiary hearing in their opposition to our papers. As has become clear from Mr. Jakes' argument and was, I think, probably clear the whole time, they simply thought they were going to win. But they were mistaken about that. So your argument is that they made a bad tactical judgment, they should have to live with the consequences, they didn't ask for a hearing too late now for them to say they wished that there had been a hearing. Well, not only did they not ask for a hearing, Your Honor, they actively discouraged the magistrate judge from holding a hearing. By doing what? By saying in their papers at A1393 that a bench trial was totally unjustified. That's their word? Totally unjustified is a quote from their papers, Your Honor. Now, they had every opportunity to put in any and all evidence they wanted. They could have put in affidavits. They didn't do that. They could have offered Narcisse's testimony at the hearing on the motion. As one of Your Honors noted, they certainly put in additional documentary evidence at that hearing. There was nothing that ever prevented them from putting on any and all evidence that they wanted to do so. They simply made a tactical decision not to do that, and they, frankly, I think, have to live with that, Your Honors. Was the deposition of Narcisse in the record on the motion? Yes, Your Honor. Both sides submitted it. Mayhouse submitted it. Levitin resubmitted it. At the time that it was submitted, there hadn't been any ruling as to whether the objections that resulted in numerous non-answers were proper objections or not, right? No, there had not been a ruling. So if there had been a ruling on your motion to compel answers, there might have been answers that would have illuminated this case greatly. There may well have been, yes, Your Honor. But, frankly, we can never know what those answers were going to be. Well, that's my problem is that there's some black holes in this case where we have a kind of a half an explanation from Narcisse, but we really don't have the whole story from Narcisse because his then lawyers blocked him from answering a very large portion of the question. That's right. And the case law from this court and others is clear that a bare denial of intent to deceive, for example, it's not material, it's not prior art, no explanation for why it's not material, no explanation for why it's not prior art, a bare denial of intent to deceive, which is all we have here, does not suffice. Weren't some of the answers that would have been relevant to exactly that question the answers that were blocked by the attorney? Yes, exactly right, Your Honor. Counsel, I have to bring you back because I feel that you made a misrepresentation to this court, and I don't find it to be very palatable. In footnote four on page A1393, to be clear, what the appellants said was thus, in order to rule on Mayo's motion, the court would need to reopen discovery and conduct a bench trial on inequitable conduct, an exercise that would be totally unjustified for the reasons we say in this opposition. They make it clear that if the court's going to rule on inequitable conduct, they absolutely would have to have a bench trial. They only say it's unjustified because they say we've provided adequate explanation that would obviate the need for that bench trial, but if you're going to rule on inequitable conduct, you absolutely would have to have a bench trial. And I think you characterized to this court that they said a bench trial is totally unjustified, and I don't think that that's very fair. Well, I apologize. I certainly didn't mean to mischaracterize that in any way, shape, or form. Your Honor is right. Their point is if you want to rule for Mayhow, you should hold a bench trial. Because there are disputed issues of fact, and what you told this court was that they told the court not to have a bench trial. It would be totally unjustified, and that is not at all what that footnote says. Respectfully, I read it a different way, but I certainly leave your honor to your interpretation. Well, let's pursue that a little further. Not the misstatement, but we assume that was inadvertent and we'll move on to the merits. But if the magistrate judge was fairly urged, as that quotation seems to suggest, that if you're going to rule against us, we assert our right to a trial. If you rule for us, we don't want a trial. But if you're going to rule against us, you've got to first give us a trial. Why wasn't that a fair position for them to take and take clearly, and yet the magistrate judge did rule against them without giving them the trial that they had thought, expressly thought? Well, I think what we have here is a desire on Levitin's part to have hearing after hearing. We want to give it a shot on the papers and we want to hold a hearing. Let's not stray off the point. At the moment that they told the magistrate, if you're going to rule for us, we agree that no hearing is needed. But if you're leaning to rule against us, we're demanding a trial. Now, is there something improper with their taking that two-part position before the tribunal? Well, what actually happened in this case is that the... Come on, answer the question. Is there something improper in their taking that position? If you're going to rule against us, you've first got to give us a trial. I think it's improper for them to suggest that we need to have multiple opportunities here. There was a hearing that the magistrate judge conducted. They had every opportunity. Is that a yes answer? Yes, it's improper. They aren't allowed to demand a trial in the face of adverse ruling. I think that is improper, Your Honor. Why? I think that it's improper to suggest that we win, and if we don't win, we should get additional process. Well, what's wrong with it? It's contrary to the official resolution. It's a time saver. It's a time saver. Look, we think our case is so strong. You're the judge. You may disagree. If you disagree, that's your right. But in that event, let us have a trial because if the judge agrees with them, everybody saved a lot of time and money and trouble, including court time, which is very scarce. On the other hand, if the ruling is likely to be adverse to them, then we have to spend the money and the time in the trial and have the normal proceeding on a withholding type inequitable conduct charge of trial. Right. And once again, they had every opportunity to put in any and all evidence that they wished to do so. We could have seen declarations from Narcisse. We could have seen Narcisse show up at the hearing and offer live testimony, but that didn't happen. They made no effort whatsoever to do that. They tried to preserve the right to bring in Narcisse by saying, if you're leaning to rule against us, first give us a trial, because obviously at the trial who they would bring in is Narcisse. I guess I'm a little unclear on one thing, and I guess obviously there's some disagreement as to how one is reading the footnote, but I read the footnote to just say, so tell me if I'm wrong, that in order to rule on the motion, you need to do this. In other words, not necessarily saying if you're going to rule against us, give us this hearing, but in order to rule on the motion one way or another. Is that the way you read it? That is how I read it. And so did they ever pursue this in any way, shape, or form during the hearing that they had before the judge? No, Your Honor. So they never referenced again? They never referenced again. They never made any effort to actually bring the witnesses. They never made any effort to submit a declaration. We've certainly never seen a proffer of how Narcisse's testimony, live testimony, could in any way expand upon the issues that were addressed quite thoroughly, I think, in his deposition, albeit with the cutoffs of these inappropriate work product objections. Counsel, where are we as a practical matter? Is this patent just a dead duck forever against all parties? Well, technically there has not been a judgment of inappropriate conduct. Well, let me ask it this way. If we were to affirm, wouldn't the practical effect of this patent be it's totally dead as to all comers forever? I think it would be very difficult as a tactical and practical matter to enforce it. There's no judgment of unenforceability, but certainly I would imagine that Levitin would find some challenges. Well, let me change the hypothetical. If we affirm, and in our opinion say, we agree with the finding of inequitable conduct as well as litigation misconduct, and therefore we affirm the award of a million dollars or so in fees, isn't that an appellate judgment that inequitable conduct was proven, and in that event, isn't the patent totally dead? Yes, sir. I think it would be very difficult for them to enforce it. Well, I thought actually Monsanto says unenforceability is automatic from a determination of inequitable conduct. Am I misremembering that case? I didn't understand it to suggest a separate judgment paper was necessary. Your Honor may be right about that. My understanding is that you need to have an actual judgment if the underlying findings of fact may be sufficient under Monsanto case. But we don't even have the patent before us. I mean, the case has been dismissed. That's right. All we have before us that's open is a motion for attorney's fees. That's right. So it's not clear to me how, I mean, I think you could find inequitable conduct, but in terms of the patents, declaring the patent unenforceable I think would be a stretch in our jurisdiction. And if I may, that is the point that I was trying to get at. There is no judgment of unenforceability. There is nothing that has been entered by the district court that renders this patent unenforceable as a matter of law. Again, as a practical matter, I think it would be very hard for them to do. Let me ask you this. I'm the trial judge, and now the same patent is asserted against a new alleged infringer. And it's pointed out to me that the Federal Circuit has affirmed fees explicitly based on inequitable conduct. I'm the district judge in the later case. Do I have any choice other than to dismiss the complaint because there's no assertable patent? It's been adjudicated as unenforceable, not in a paper-labeled judgment, but still in an appellate-affirmed decision. I think that unless Levitin had a way of distinguishing and arguing against that, I think that would be the right decision. But again, I don't know that it would, for example, be a Rule 11 violation to try to enforce the patent. Maybe let me refresh your recollection on Monsanto. A district court has no discretion to decide whether a patent is unenforceable once it enters a finding of inequitable conduct. Any distinction between the two findings is merely semantic. Doesn't that dispose of that issue? Your Honor may be right about that. I would certainly never suggest for a moment that the issues we have in front of us are not extremely serious issues. They are. It's extremely serious whether Mr. Narcisse and the other attorneys at Greenberg Trial committed inequitable conduct. It's very serious whether they committed inequitable conduct not just in the copying and the withholding of Germain, but we also have the failure to disclose related litigations that we haven't spent much time on. But I will tell you, I think it's the simplest issue in this case and can be dispositive of this case. On the litigation misconduct, I think the other side's response to that, that at a minimum that would require some apportionment sending it back. Wouldn't we at least have to have somebody evaluate whether apportionment would be required if we declined to rule on inequitable conduct or whatever and just went on the litigation misconduct route? That is their position on litigation misconduct, and I hope I didn't misspeak. What I meant to say was the easiest issue in this case is the inequitable- Do you agree that we would have to, if we exclusively ruled on the litigation misconduct, it would have to be sent back for some apportionment? That is the holding below. We've never challenged that, Your Honor. But the other inequitable conduct theory upon which this case can be resolved is the failure of Levitin's patent prosecutors to disclose related litigations involving the parent patents of the 766. These parent patents, they're patents from which the 766 purports to continue or continue in part. Why is that easier to do? They've disputed materiality with respect to that as well, right? The same disputes arise with respect to that intent. I don't think so. I think the issues there are a little bit different, Your Honor. And I think the issues there are different because Levitin's argument is that it shouldn't be required to disclose related litigation unless there's other material information arising out of those cases as well as the fact of litigation. Well, this Court's case law and the MPEP are both clear on this point. If you refer to Section 2106C of the MPEP, you will find that it requires both the fact of related litigation and separately requires material information arising therefrom to be disclosed to the patent office. Now, the court in the Nielsen case has affirmed the MPEP and has said that it will not question that. And the district courts regularly cite Nielsen for the proposition that related litigation, the fact of related litigation is material per se. Now, Levitin doesn't argue that that's wrong. It doesn't argue that Nielsen should be overturned. The court just argues that, in fact, you should require both the fact of litigation and material information to be disclosed, and that's just not what the law is. Did Narcisse in the deposition that he has, did anybody, was he questioned? Was there any excuse provided, any rationale provided for not disclosing pending litigation? No, Your Honor, and that's the thing. There is absolutely nothing in the record, even though Levitin said every opportunity, there is nothing in the record to explain why he didn't disclose related litigation that he himself was involved in. He's litigating the case. I thought I saw some argument, and maybe it was just in the briefs here on appeal, that somebody made the argument at least that it wasn't necessarily material because the outcome of that litigation did never invalidate editing of the patents. Is that just an argument, an attorney argument that's been made on appeal? Yeah, that is an argument we see in the papers. There is nothing about that in Mr. Narcisse's deposition, and, of course, he couldn't have known that at the time that they filed the application for the 766 patent because there were litigations that were ongoing. Was there any final result in any of these related litigations as of the time that the prosecution that led to the patent concluded? I couldn't tell you off the top of my head whether any of the cases had been resolved. I know that some were ongoing. Levitin has never received a judgment on the merits in its favor in any of those cases. Yeah, well, the question is, the real important point is, did it receive any adverse rulings that the patent examiner, sure as hell, would have wanted to know about? No. I believe that my recollection, Your Honor, is that all of those cases were either resolved or, in one case, this Court affirmed a finding of non-infringement based on claim construction. So to the extent there were rulings in those related cases, none of them were adverse to the patentee here? There were no findings of non-infringement. There were no findings of invalidity. They just never got that far. But let me ask you, to be clear, he was involved in at least several of those litigations. Yes, he was attending hearings, depositions. Is there evidence in the record, can we put together in the record, the fact that he, at the time that he was prosecuting the 766, the litigation which he was involved in had not yet been resolved? That is not in the record, I believe, Your Honors. Now, you referenced the manual of patent examining procedures that has language requiring the fact of litigation to be disclosed to the examiner. And you referenced the Nielsen case as having, in some sense, adopted or followed or blessed, whatever the right verb might be, that particular MPEP provision. Yes, sir. But do you think that we're bound by that with respect to finding inequitable conduct? Well, I certainly think that you are bound to follow the Nielsen case. Well, of course. That's not the question. The question is whether we're bound to follow every line in every MPEP provision in the context of inequitable conduct. No, sir. So then we'd be free to ignore the apparent requirement that the very fact that a litigation is pending has to be immediately disclosed to the examiner. Well, may I read you a very brief passage from the Nielsen case? What's the answer to the question? The answer to the question is that Nielsen addresses that very issue, and it holds that the fact of litigation must be disclosed to the examiner. Or what? Well, that it is material information that must be disclosed to the examiner. Or it's automatically inequitable conduct? No, sir. As always, one must find an intent to deceive in order to find inequitable conduct. So what is the evidence of intent on the litigation? What is your evidence of intent? Well, the evidence of intent is that Mr. Narcisse is involved in the litigation. He's well aware of it. And it is never disclosed in 766. That's certainly knowledge. I give you that. It's knowledge. But knowledge doesn't rise to the level of intent. So what is the standard you'd like us to apply to sort of pigeonhole this into an intent? Well, I think there is evidence of intent here. And the evidence of intent is that he knew about it, knew that he had a duty to disclose it, and didn't do it. When it's presumed to intent. Well, wait, wait, wait. Hold on. Before you go into presumed, because that's going to raise its own problem for me, what exactly do you mean he knew about it and had a duty to disclose it? Because that standard would encapsulate every time someone knows about a piece of prior art and doesn't disclose it. So that, to me, certainly cannot be our standard on intent. I mean, in Kingstown we rejected gross negligence, for example. So simply knowing about it and not disclosing it doesn't seem to me is intent to deceive. It couldn't possibly. It would capture everything. Well, if I may, Your Honor, he knows about the litigation he's involved in. He knows that he has a duty to disclose related litigation. Hold it. How do we know that he knew that because of that line in MPEP, he had a duty to disclose the bare fact that a litigation was pending?  Of this specific requirement? I believe he did. To notify the examiner of the fact that a lawsuit was filed yesterday? Yes, sir. Where is his answer that says that? If I may. I think that's kind of important. Narcisse was aware of it. It's at A-1975 of the testimony. If I may, Your Honor, this is a bright line rule. Aware of what? He is aware of his obligation to disclose. I think this is the kind of bright line rule that every patent prosecutor knows. Now, he, of course, said he was specifically aware of it. But Mr. Narcisse. I'm on A-1975. That's what you referred me to, right? Hopefully you're going to give me a precise quote. I don't see anything about the MPEP. I see that he's aware of the litigation, but I don't see any reference to the MPEP anywhere on this page. You're right, Your Honor. I think I have an error in my notes. I think my notes refer merely to his awareness of the litigation. I'm happy to provide it to Your Honor. I think it may be the next page, 1976, although I haven't had an opportunity to read everything in there. It's certainly his discussion of the MPEP. It's on 1976. He testifies at some length that he's familiar with the MPEP. He knows that he needs to follow it. Well, of course he's familiar with it in general, and of course he knows he needs to follow it. That's not quite the same as saying he knows that the MPE requires him to immediately tell the examiner the minute a lawsuit has been filed involving any related patent. They aren't the same thing. Yes, that may be true, Your Honor, but with respect, we're not talking about something that was filed the minute before the 766 application is filed. We're talking about years of ongoing litigation involving the parents. But it hadn't reached any conclusion, you said earlier. That's right, Your Honor. So it's the mere pendency of a lawsuit, and you're saying, well, since he knew about the manual in general, he must have known that the mere pendency of a lawsuit always has to be promptly, reasonably promptly submitted to the examiner. Yes, sir. I believe he's aware of it, and that's certainly Your Honor's case law. Can I ask just sort of a separate question? Sure. And that goes back to the point you were making about whether or not what effect, what res judicata effect, you think in this case has on the enforceability of the patent. What if we were to disagree with the other side in terms of the standard of review that's applicable here? What if we thought that it's not the summary judgment de novo standard because this is a motion for attorneys fees, and I think as you point out, the standard of review is clear error. Right. How could that fairly then be a res judicata of the enforceability of the patent, given that the finding of enforceability in another context other than a motion for attorneys fees, i.e., a regular case of inequitable conduct, would have a different standard of review? Well, that is the point that I was trying to make earlier, Your Honor. There's not going to be a judgment of unenforceability. Our claims as to unenforceability have been dismissed. I think the practical effect is that there's no way this patent could be forced. I think that is absolutely the practical effect here. But not the legal. I think that may not be. I think it is certainly a debatable point whether that's the legal effect. Now, I have the impression, counsel, that you are in effect saying Narcisse didn't give a good enough explanation of his conduct, and therefore on that basis it's appropriate and fair to find as a fact that he had intent to deceive the patent office when he elected not to submit the germane application. That's right. Excuse me. The court has case law. It stands for the proposition that a bare denial of intent to mislead will not suffice. That's not the point. The point is, aren't you in effect saying that under these circumstances, the burden was on him to prove he's innocent as opposed to the burden on you, the challenger of the patent, to prove he's guilty of inequitable conduct, particularly with respect to the required intent? Well, I think we have proven that, and I think the fact that they brought in frivolous work product claims to cut off the answers, you know, I don't believe it's material. How do we know they were frivolous? There was no ruling by the magistrate judge, as I recall. So why should we assume they were frivolous? The opinion below details at some length her findings that those were frivolous objections, that it is part of the basis for her conclusion that Levitin committed litigation misconduct. Well, what about the burden of proof question? I'm still troubled by this idea that since the patent prosecutor didn't give a stronger explanation, that the gaps in his explanation are affirmative proof of intent to deceive. I don't see how we'd get there. Well, for example, in the Daco and Akron cases, both of those cases involved situations where we had co-owned applications that were prosecuted by the same attorneys and had substantially overlap. No, no, no, we all agreed he knew everything. He knew about the pending litigation. He knew about the other patents. He was involved in the prosecution of all the patents and in almost all the litigation. Of course he knew. The question is whether he had deceptive intent. And to the extent you're saying, well, he had deceptive intent because we don't think his explanation was very good, that sounds like you're shifting the burden of proof off of you onto him, which doesn't seem consistent with our case law. Well, I don't think we're shifting the burden of proof. But if I may finish my thought, which I think is I'm trying to answer your question, sir, is that in both of those cases that knowledge and failure to act and awareness of the risk would have been enough, but for other circumstances not present in this case, would have been enough to find an intent to deceive. That's true in both Akron and Daco. And there are other cases in which the court makes clear that prosecutors can't have this sort of bare denial. I don't think that shifts the burden of proof, Your Honor. Yeah, but we're not talking about bare denial. We're talking about who has the burden of proof. And I'm concerned that you're implicitly arguing that at that juncture, given the other facts that were of record and not disputable, that Narcisse either had to give a damn good explanation or he was going to get hung for inequitable conduct. And that sounds like shifting the burden. I don't think we are shifting the burden here, Your Honor. There is the very marked failure of Mr. Narcisse to give any explanation or refuse to give an explanation. But we have other evidence of intent to deceive here. We have a very strong motive, for example. The motive here is that Levitin is trying very hard to get a new patent to fuel litigation because, frankly, other cases aren't going particularly well. And we know that they're trying to get it quickly. That's why there's a petition to make special. They're trying to move that through. And importantly, counsel in this case have their own financial interest in obtaining a new patent that can be litigated against the same companies they've been up against before, which is precisely what happened. Greenberg Traug and Narcisse and his supervisors have represented Levitin in litigation for many, many years, both litigation and patent prosecution. As we see in the malpractice complaint, they represented them in substantially everything for 30 years. You're not saying they had a financial stake in the patent? They had a financial stake in the litigation that they knew was going to come out of the patent. Well, doesn't – I mean, forgive me if I'm wrong, but don't a lot of firms who prosecute patents actually have a good client relationship and want to represent those clients in litigation? I mean, that to me sounds like it's not a motive to deceive because it seems relatively routine. I mean, isn't it the case that most firms, when you prosecute something, you then have a leg up for getting the litigation? Sure, that may be true, and, of course, it isn't a motive to deceive in all cases, but it is part of, I think, what's actually going on in this case. They're trying to move this particular patent application with the copied claims through the patent office as quickly as possible so that they can obtain new litigation. This is true of both Levitin and Cancel. And this is all your spin on it, and you know what? You might be right, and a fact finder might actually agree with you, but done in the context of a no genuine issue of material fact is what I'm finding so troubling. And I understand that, Your Honor, but as we've said before, I think the basic facts of this case are not disputed. I don't think they'll agree with you on motive. That's just my guess. You may be right about that, Your Honor. What about the fact that the attacker in an inequitable conduct charge has an elevated burden of proof? They not only have to carry the burden of proof all the way to the goal line, and it doesn't shift as I understand the law, but they have to do it by clear and convincing evidence. So where's the clear and convincing evidence here that when he didn't submit the germane application, his state of mind was I'm going to fool the patent examiner, I'm going to cheat, I'm going to lie, I'm going to steal a patent because that's what I want to do. Where's the clear and convincing evidence of that? Okay. As I said, I think we have issues of motive. I think we have an experienced prosecutor who knows all the rules, knows all the facts, knows what he's doing. Your Honor's case law is clear that evidence of intent to deceive need not be direct. We never have admissions of intent to deceive in these cases. That wouldn't happen in a contested case. The question isn't whether there has to be a confession by the prosecuting attorney. The question is wherein lies the evidence that gets you from a lower standard to the higher standard of clear and convincing. Your Honor's case law, there are multiple cases that recognize that the clear and convincing standard can be met when an experienced prosecutor has all the facts, is aware of the material information, is aware of the danger of disclosing the material information. For example, Narcisse was aware that a double patenting rejection was at least a possibility here. That's a good reason for him not to disclose. They're trying to move this through quickly. They don't want to mess up their petition to make special by disclosing all of this messy information that, as Mr. Jakes acknowledges, is at least going to require the examiner to go back and take a harder look. Whatever the examiner may or may not decide, but it's going to require the examiner to go back and take a harder look. All right. Thank you. Thank you, Your Honors. Mr. Jakes, I'll give you back the time you sought to reserve because we had a great many questions of you and opposing counsel. Thank you, Your Honor. If I could start with just talking about the burden of proof and the lack of intent to deceive. What the judge relied on here was really materiality, finding that the information was material, and that Narcisse had knowledge. That's really the foundation of the intent to deceive, and that can't be it because this court's case law has said failure to disclose doesn't presume intent to deceive. Let me ask you a question about how you read Praxair. I read and reread and reread the three-part test of Praxair. My interpretation of it is that it only applies where the proof shows that the prosecuting patent attorney not only knew of the information, but knew that it was highly material. Do you agree with that? I believe that case has to be read that way. Even then, it's in tension with Kingsdown and gross negligence because gross negligence could explain both of those factors, and I think that assumes that if you have those two that it's something more than gross negligence. Well, that goes to the phrase in the same portion of the Praxair test of should have known. Yes. But I'm putting aside should have known. I'm just focusing on the idea that seemed to be embedded in that standard, in the Praxair opinion, that it only applies if the prosecuting attorney knew that the information he was not submitting was highly material, not just material but highly material. Yes. Well, you can see a situation the attorney knew was highly material and forgot. That would be gross negligence, but not necessarily an attempt to deceive. So I think there is some tension with Kingsdown in that finding. And I would assume that your argument here would be that even if Judge Michelle's suggested interpretation is correct, that the litigations, for example, a simple fact of litigation can't be highly material. That would be your argument as I understand it. That's right. Is that right? And if you look at what those litigations concern, they concern the parent patents. They have a separate feature in them, this reset lockout feature, which is not in the 766 patent. So is it a related litigation? Well, perhaps. But simply saying that is not enough to say that it's material. If there had been an invalidity determination in there that was highly relevant, then that would be different perhaps. Is that right? That's different. There could be other information from that litigation. There could be expert reports. There could be prior art. We haven't seen any of that. How do we judge whether that information might have been entirely cumulative of what was already in front of the examiner? Let me ask you just to be clear. In the deposition of Mr. Narcisse, he never responded to any of the questions with regard to this that he forgot. I mean, that was never a reason put forth by him, correct? No, it was not. No. No, he did testify that he understood. He was familiar with the MPEB. I don't believe there's any testimony that he was familiar with this particular rule or regulation. He certainly was familiar with the litigations. But where the intent, I think, falls apart is if you focus on let's take away his explanation entirely. Suppose he hadn't testified at all. There would still be no evidence of an intent to deceive because all you have is materiality and knowledge. We dispute materiality, but assume that. And this Court's cases have said that's not enough. And if there is no explanation, there still has to be some other evidence of intent. He did have an explanation here, maybe on remand in front of the judge, hearing his testimony live. What about star scientific and its reference to, yes, it can't just be any reference or any inference, but that there can be. You take the single most reasonable inference, and that's what you use in the context of intent. I mean, star scientific doesn't say you can't draw any inferences about anything. You can always draw an inference in the context. Yes, and where there are more than one reasonable inference, you can't find the one that ensures an equitable conduct if there is another explanation. What's the reasonable inference here? From Mr. Narcisse? Yes. He didn't believe it was prior art or material. Most patent attorneys think of prior art when they think of materiality. Only prior art. Well, I will admit. Let me just make a clear answer. You said he didn't think it was prior art or material. I thought you were telling us before his rationale was he didn't think it was prior art, and therefore it was not material. There's a little difference. I think you're right. I said or, and it was true. His testimony is he did not think it was material, and the reason was because it was not prior art. You look at the sequence. You agree that that's wrong, but you maintain that most patent attorneys probably have the same view. That's what they're concerned with, mostly, is prior art. And if you look at the sequence of these applications, he filed a continuation. He had support for it. What about this problem? If the defense here is, well, it may be wrong, but it's what the vast majority of patent prosecutors actually believe, wasn't it the burden of your side to bring in some affidavit evidence or deposition testimony of a number of patent prosecutors that, yeah, technically may be under MPEP provision, blah, blah. It's actually defined as material, but we all assume that if it isn't prior art, it can't be material. And you didn't put in such evidence. We did not. We did not put in additional evidence. Why isn't that fatal? Even if I agree with you that most patent attorneys may think only prior art creates materiality, if there's no record evidence of that in this proceeding, then why isn't that fatal to your case? I don't think it's fatal. I think that you can say his explanation is plausible without having that confirmed by 100 practitioners. Isn't the plausibility of that detracted from in this case because there were so many other reasons to do it? In other words, potentially, maybe it won't rise to the level of high materiality, but there was the double patenting issue. There was the inventorship issue. There was the related litigation issue, and there was the copying issue. I think there may be even another one. So in this case, it was that, and it wasn't just, well, you should have thought of the fact there was double patenting. I mean, there were at least a whole list of potential things. If one were familiar enough with the case law and the MPEP, they would have known that those were relevant for materiality. I think there are only really two things. There's germane and the related litigations. You may have multiple reasons that the court gave as to why germane was material. It's still germane. But germane implicates the double patenting question. It implicates an inventorship question, and it implicates a copying question. Am I right about that? That's what the court said. I have maintained that it really does not implicate those things, and it wouldn't have been material to that because at most it would have led the examiner to a wrong conclusion or to look at it. There is no evidence about inventorship 112, any of those things. And so on the related litigations, I should point out the district court did not include that in his opinion. That was only in the magistrate judge's opinion. That is not repeated. And as I said, that dealt with the parent patents on a different feature, and to equate that as to per se materiality. Well, he adopted the entirety of the report. He did. Which included that, right? He did. But to be fair, he also did not discuss that part of it while he's discussed all the other portions. So we do have something somewhere in between. We've given both sides a great deal of extra time because it's a very important and difficult, complicated case. We appreciate the careful argument and briefing by both attorneys. We'll take the appeal under advisement.